UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JOHN PERRINO, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 21-cv-11267-ADB |
| KILOLO KIJAKZI, ACTING COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | * | |
| | * | |
| Defendant. | * | |

## MEMORANDUM AND ORDER

BURROUGHS, D.J.

Plaintiff John Perrino ("Perrino") brings this action pursuant to § 405(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claim for Social Security Disability Insurance ("SSDI") benefits. Currently pending are Perrino's motion for summary judgment, [ECF No. 17],[1] and the Commissioner's motion to affirm her decision denying SSDI benefits, [ECF No. 23]. For the reasons set forth below, Perrino's motion, [ECF No. 17], which

---

[1] Although Perrino labels the motion as one for summary judgment, the motion and memorandum seek reversal and remand of the Commissioner's denial of disability benefits. Because the substance as opposed to the label of a motion "is controlling[,]" In re Nieves Guzman, 567 B.R. 854, 863 (B.A.P. 1st Cir. 2017), Perrino's motion will be treated as a motion to remand the Commissioner's final decision under 42 U.S.C. § 405(g). See Perez-Perez v. Popular Leasing Rental, Inc., 993 F.2d 281, 283 (1st Cir. 1993) ("[o]ur inquiry into the character of the motion is a functional one: 'nomenclature should not be exalted over substance'" (citations omitted)).

1

the Court construes as a motion to remand, is <u>DENIED</u>, and the Commissioner's motion to affirm, [ECF No. 23], is <u>GRANTED</u>.

I.  **BACKGROUND**

  A.  **Statutory and Regulatory Framework: Five-Step Process to Evaluate Disability Claims**

"The Social Security Administration is the federal agency charged with administering both the Social Security disability benefits program, which provides disability insurance for covered workers, and the Supplemental Security Income program, which provides assistance for the indigent aged and disabled." <u>Seavey v. Barnhart</u>, 276 F.3d 1, 5 (1st Cir. 2001) (citing 42 U.S.C. §§ 423, 1381a).

The Social Security Act (the "Act") provides that an individual shall be considered to be "disabled" if he or she is:

> unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.

42 U.S.C. § 1382c(a)(3)(A); <u>see also</u> <u>id.</u> § 423(d)(1)(A)–(B) (also defining "disability").  The disability must be severe, such that the claimant is unable to do his or her previous work or any other substantial gainful activity that exists in the national economy.  <u>See</u> 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. § 416.905 (2012).

When evaluating a disability claim under the Act, the Commissioner uses a five-step process, which the First Circuit has explained as follows:

> All five steps are not applied to every applicant, as the determination may be concluded at any step along the process. The steps are: 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the applicant's "residual

functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

Seavey, 276 F.3d at 5 (citing 20 C.F.R. § 416.920).

Claimants have the burden of proof through Step Four of the analysis, including the burden to demonstrate residual functional capacity. See Flaherty v. Astrue, No. 11-cv-11156, 2013 WL 4784419, at *8–9 (D. Mass. Sept. 5, 2013). At Step Five, the Commissioner has the burden of showing the existence of jobs in the national economy that the claimant can perform notwithstanding their restrictions and limitations. Goodermote v. Sec'y of Health & Hum. Servs., 690 F.2d 5, 7 (1st Cir. 1982).

### B.  Procedural Background

Perrino applied for SSDI benefits on December 21, 2018, alleging that he became disabled on December 2, 2014, [R. 120][2]—later amended to May 15, 2018, [R. 48], after his initial claim was denied—as a result of injuries he sustained when he fell about 25 feet down an open elevator shaft while working a union laborer job, [R. 338, 377]. The Social Security Administration (the "SSA") denied Perrino's application, as amended, on May 9, 2019, [R. 142], and on reconsideration on October 30, 2019, [R. 146]. Thereafter, Perrino requested an administrative hearing, [R. 149], which took place before Administrative Law Judge Alexander Klibaner (the "ALJ") on October 27, 2020, [R. 44, 166]. On November 4, 2020, the ALJ issued a decision finding that Perrino was not disabled. [R. 18]. Perrino sought review from the SSA Appeals Council, [R. 13], and on June 16, 2021, the Council denied his request for review,

---

[2] References to pages in the Administrative Record, filed electronically at ECF No. 14, are cited as "[R. __]."

[R. 6].

###   C.   Factual Background

Perrino was 47 years old at the time of his amended onset date (May 15, 2018).  See [R. 48, 120].  He has a twelfth-grade education.  [R. 127].  From 1994 through 2014 he worked consistently as a union laborer.  [R. 252].  On December 2, 2014, he fell about 25 feet down an open elevator shaft while working a union laborer job.  [R. 52, 338, 377].

###   D.   Medical Evidence

Perrino has sought treatment for numerous physical ailments that he attributes to his 2014 fall, including: left shoulder traumatic arthropathy with associated rotator cuff tendinopathy, [R. 350]; left C6-7 disc protrusion, [R. 361]; recurrent shoulder instability, [R. 368, 628]; bilateral ulnar sensory neuropathies, [R. 786]; bilateral carpal tunnel syndrome, [R. 790]; post-surgical adhesive capsulitis, [R. 792]; and chronic pain, [id.].  He also claims that the fall and resulting injuries triggered psychological ailments, including major depressive disorder, [R. 973], mixed anxiety and depressed mood, and post-traumatic stress disorder ("PTSD"), [R. 624].

####   1.   2018–2019

In June 2018, Perrino saw Dr. Frederick Mansfield for an orthopedic follow-up regarding continued numbness and paresthesia in his left arm in the aftermath of his 2014 injury.  [R. 361].  Dr. Mansfield noted in Perrino's chart that a Magnetic Resonance Imaging ("MRI") exam showed a left C6-7 disc protrusion and that an Electromyography ("EMG") exam showed mild bilateral carpal tunnel syndrome and mild left ulnar sensory neuropathy.  [Id.].  At the appointment, Dr. Mansfield advised that Perrino could consider, as methods of treatment, a left C7 selective nerve root block or a cervical disc excision and fusion, though the doctor noted that

4

he was less optimistic about the root nerve block. [Id.]. Dr. Mansfield also noted that Perrino was "inclined" to seek repair of his destabilized shoulder. [Id.].

In October 2018, Perrino attended another orthopedic follow-up appointment with Dr. Zachary Zimmer where he complained of persistent left shoulder pain. [R. 370]. It was Dr. Zimmer's assessment that Perrino's pain stemmed from an injury to his neck rather than his shoulder and that shoulder surgery would not resolve his symptoms. [R. 371]. Dr. Zimmer recommended that Perrino obtain a more up-to-date MRI arthrogram[3] so his shoulder could be reevaluated prior to any surgery. [Id.].

In December 2018, Perrino's primary care physician ("PCP"), Dr. Haldor Barnes, completed a residual functional capacity questionnaire. [R. 30, 483–86]. Dr. Barnes concluded that Perrino could walk for less than one city block without rest or severe pain; could sit or stand for 15 minutes at a time; could stand or walk for a total of less than two hours over an eight-hour workday (including breaks); required the ability to shift between sitting, standing, and walking on the job; needed to be able to walk for ten minutes every 15 minutes; required unscheduled 15 minute breaks every 15 to 20 minutes due to pain, paresthesia, numbness, and/or muscle weakness; required the ability to elevate his legs 12 inches for 15 percent of the workday; could rarely lift ten pounds, twist, stoop, or crouch/squat; could never climb stairs or ladders; could never grasp, turn, twist, perform fine finger manipulations, or reach horizontally or overhead with his left upper extremity; could only grasp, turn, twist, perform fine finger manipulations, or reach horizontally or overhead with his right upper extremity for 30% of the day; would be off-task due to symptoms severely interfering with attention and concentration 25% or more of the

---

[3] An MRI arthrogram is an MRI performed after a joint is injected with a solution containing a contrast dye that enables physicians to better view the details of the joint.

workday; was incapable of even "low stress work"; would have exclusively "bad days" in terms of his level of impairment; and that his impairments were reasonably consistent with these symptoms and functional limitations. [R. 573–75]. Dr. Barnes also listed chronic obesity as one of Perrino's diagnoses. [R. 397–98].

In March 2019, a Massachusetts State Agency review physician, Dr. Birendra Sinha, evaluated Perrino's records and found that he could occasionally lift 20 pounds, frequently lift ten pounds, could sit or stand for about six hours of a workday with normal breaks, had postural limitations (including "occasional" limitations as to "climbing ramps/stairs," "climbing ladders/ropes/scaffolds," "balancing," "stooping," "kneeling," "crouching," and "crawling"), and was "limited" in reaching with his "[l]eft in front and/or laterally," or "[o]verhead." [R. 113–15]. Another State Agency review physician, Dr. Elaine Hom, made substantively similar findings in October 2019. [R. 131–33].[4]

Based on Drs. Mansfield and Zimmer's recommendations, in August 2019, Perrino underwent a left shoulder Latarjet stabilization procedure, which was performed by Dr. Jon Warner. [R. 711].

After the operation, Perrino continued to experience tingling and weakness in his left arm. [R. 884]. An EMG exam in November 2019 showed that he had bilateral median neuropathies at the wrists, such as can be seen in carpal tunnel syndrome. [Id.].

    2.    2020

During a February 2020 follow-up appointment, Perrino reported to Dr. Warner that he was experiencing continued pain, but while Dr. Warner did observe a limited range of motion, he

---

[4] Perrino's brief refers to a "Dr. Horn." See [ECF No. 18 at 3]. There is no Dr. Horn mentioned in the record and as best as the Court can tell, Perrino meant to refer to Dr. Hom.

6

did not observe any obvious instability. [R. 1024]. Perrino also reported that he had not attended physical therapy since November 2019 because it was no longer covered by his workers' compensation benefits. [Id.]. Dr. Warner then recommended four to six weeks of physical therapy to address concerns regarding Perrino's strength and flexibility. [Id.]. In April 2020, Perrino again reported that his workers' compensation had denied coverage of physical therapy, and Dr. Warner recommended home exercises, and noted that he would need physical therapy again when the pandemic ended. [R. 1029]. Also at that visit, Dr. Warner observed that Perrino "has pain all the time and can't put hand behind back[,]" "had pain before [the] surgery . . . [s]o pain was his baseline[,]" and that his "diagnosis . . . is post-surgical adhesive capsulitis and chronic pain." [Id.]. At another follow up in July 2020, Dr. Warner found that Perrino had a limited active range of motion in his left shoulder, but that he had full passive range of motion. [R. 1030]. Dr. Warner noted that Perrino had "excellent" strength and that everything "structurally" appeared normal. [Id.].

### 3. Prior to Onset Date

The record also includes medical records and opinions prior to the alleged onset date. First, in April 2015, independent medical examiner Dr. Michael Murphy found that Perrino was capable of work but that he would be unable to lift more than ten pounds overhead with his left upper extremity on a regular basis; could push and pull objects weighing up to 50 pounds; and had no restrictions with regard to bending, kneeling, or squatting. [R. 962, 967]. Second, in August 2015, Dr. Hillel Skoff conducted an independent medical evaluation and found that Perrino was unable to return to work as a construction laborer, though his report primarily discusses Perrino's presentation and medical history and does not list specific functional limitations. [R. 848–51]. Third, in a letter dated January 25, 2017, Dr. Joseph Chase opined on

Perrino's diagnoses, limitations, potential treatment options, as well as Perrino's expected prognosis if he did not undergo further treatment. [R. 879–80]. Fourth, in February 2018, Perrino underwent a sleep study that resulted in a diagnosis of severe obstructive sleep apnea. [R. 978].

### 4. Medical Evidence as to Psychological Ailments

In addition to his physical ailments, the record includes medical evidence as to Perrino's psychological health.

Much of the record is documentation related to Perrino's treatment for anger issues by Lawrence Austin, LICSW. These records span from 2018 through 2020, [R. 576–616, 676–85, 917–38], and include numerous examples of the ways in which anger manifests in Perrino's life and his efforts to work to control and manage that anger. See, e.g., [R. 922, 931, 933]. Additionally, these records reflect that Perrino often presents as anxious, depressed, and angry. See [R. 919–28]. Mr. Austin also opined that Perrino is markedly limited in activities of daily living; has moderate difficulties in social functioning; has moderate-to-marked difficulties in maintaining concentration, persistence, or pace; and would likely incur more than four work absences per month as a result of pain and the medication he was taking. [R. 940–43]. Mr. Austin expressed that "physical limitations prevent [Perrino] from working" because his "pain level can be severe; use of arms, hands, shoulders prevent any physical labor[.]" [R. 943]. Additionally, Mr. Austin noted that Perrino is suffering from "[p]ossible memory issues from [his medicine] and chronic pain" and that his "[p]ain is also causing [an increase in Perrino's] anger [because] of constant physical limitations[.]" [R. 940].

The record also includes an opinion from Dr. Sol Pittenger following a consultative examination on May 3, 2019. [R. 617–24]. Dr. Pittenger noted that Perrino complained of

8

depressed mood, anxiety, and irritability, as well as a history of interpersonal conflicts with family and authority figures. [R. 617–18]. Dr. Pittenger's ultimate diagnosis was adjustment disorder with mixed anxiety and depressed mood and mild PTSD. [R. 624]. In addition to making a diagnosis, Dr. Pittenger opined that Perrino's impairment may be exaggerated and that the results of some of the testing performed by Dr. Pittenger "should be interpreted with caution[.]" [R. 29, 622].

In May 2019, State Agency consultant Dr. Peter Robbins reviewed Perrino's psychological history and found it "reasonable to infer" that Perrino suffered social limitations due to his irritability, as well as social withdrawal. [R. 112]. He also opined that there was not evidence to suggest acute disruption in memory, concentration, or attention span and that task performance was primarily limited due to Perrino's chronic pain rather than his mood. [Id.]. Dr. Robbins did not think Perrino met the full criteria for PTSD, but did diagnose him with adjustment disorder with depressed and anxious mood. [Id.]. In September 2019, another State Agency consultant, Dr. Frank Gonzales, reviewed Perrino's medical records. [R. 128–30]. As to Perrino's psychological health, Dr. Gonzales found that the records "d[id] not indicate[] significant material changes" between Dr. Robbins' review in May 2019 and his review in September 2019. [R. 130]. Dr. Gonzales found that listings 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), and 12.15 (trauma and stressor related disorders) were supported by the record, with moderate limitations in interacting with others, mild limitations in ability to concentrate, persist, or maintain pace and to adapt or manage oneself, and mental residual functional capacity for limited public contact. [R. 129–30].

Additionally, prior to his alleged onset date, Perrino was diagnosed in June 2017 with major depressive disorder by Dr. David Smith. [R. 971–74].

### E.     The October 27, 2020 Hearing

On October 27, 2020, the ALJ conducted a virtual hearing at which Perrino, his counsel, and an impartial Vocational Expert ("VE") appeared. [R. 44–74].

Perrino testified first, answering questions from both the ALJ and his counsel. [R. 50–67]. He testified that the injury he suffered in 2014 impaired his ability to sleep, walk long distances, exercise, move, squat, bend, lift things, hold things in his hand, focus, assist his children, assist his wife with the caretaking of his child who was born with a physical handicap, assist with household chores, play and do activities with his children, and drive for periods longer than fifteen to thirty minutes. [R. 54–59, 62–67]. With respect to lifting, he testified that he could not lift more than five to ten pounds with his left side or ten to 15 pounds with his right. [R. 65]. He further testified that his capacity to walk and to drive was limited due to back and neck pain. [R. 54, 57, 65–66].

Perrino also discussed the impact this injury has had on his life, explaining that on "good days" he spends time with his children, "being with them" and "listening to them[,]" but that he averages approximately two good days per week. [R. 66]. In addition, he testified that he does not generally go anywhere because he prefers to avoid dealing with people, [R. 64], is only able to do light housework, [R. 65], and is unable to assist in the care of his disabled child, [R. 59].

The VE testified next, [R. 67–72], and was asked about the kind of work, if any, an individual could perform if that individual had Perrino's age, education, and work experience, and could perform

> the full range of light work except he can occasionally push, pull and reach in all directions with the left arm; can occasionally climb ramps and stairs, but never ladders, ropes and scaffolds; can occasionally balance, stoop, kneel, crouch and crawl; can tolerate occasional exposure to extreme temperatures and workplace

10

> hazards and can tolerate occasional interactions with supervisors and coworkers and occasional superficial interactions with the general public.

[R. 68]. The VE testified that this hypothetical person could not perform any of Perrino's previous jobs, [id.], but could perform the job of dealer account investigator. [R. 68–69]. The VE's answer remained unchanged when the hypothetical was altered so the hypothetical person can also "occasionally handle and finger with his left hand; can lift 10 pounds with the left arm up to shoulder height; can frequently handle with his right hand." [R. 70]. However, when the hypothetical was changed such that the hypothetical person could not use his left hand, the VE testified that there were "no jobs that such an individual could perform." [Id.]. The VE also testified that, regardless of the other restrictions in any given hypothetical, if an individual was "off task 20 percent of the workday in addition to normal breaks," that individual would be unable to perform any jobs in the national economy. [R. 70–71].

### F. The ALJ's Decision

On November 4, 2020, the ALJ issued a decision finding that Perrino was not disabled under the Act. [R. 18–33]. Applying the five-step sequential evaluation process for determining whether an individual is disabled, at step one, the ALJ determined that Perrino has not engaged in substantial gainful activity since May 15, 2018 (Perrino's amended alleged onset date) through his date last insured of December 31, 2019. [R. 23]. At step two, he determined that Perrino suffered from the following severe impairments: left shoulder degenerative joint disease status-post injury and surgery; cervical and lumbar degenerative disc disease; left ulnar sensory neuropathy; bilateral carpal tunnel syndrome; obstructive sleep apnea; obesity; major depressive disorder; and generalized anxiety disorder. [R. 23]. The ALJ concluded that these impairments were severe because they significantly limited his ability to perform basic work activities. [R. 24].

At step three, he determined that Perrino does not have an impairment or combination of impairments that equals the severity of a listed impairment.[5]  [R. 24–25].  As relevant here, in making this determination, he considered listing 1.02 (major dysfunction of joints), 1.04 (disorders of the spine), 12.04 (depressive, bipolar, and related disorders), and 12.06 (anxiety and obsessive-compulsive disorders).  [R. 24].  After considering each applicable listing, the ALJ concluded that Perrino's impairments failed to meet the specific and technical criteria set forth by any of those listings.  [R. 24–25].

Before considering step four of the sequential evaluation process, the ALJ found the following as to Perrino's residual functional capacity:

> the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that the claimant: can occasionally handle and finger with his left hand; can lift 10 lbs. with the left arm up to shoulder height; can frequently handle with his right hand; can occasionally push, pull, and reach in all directions with the left arm; can occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds; can occasionally balance, stoop, kneel, crouch, and crawl; can tolerate occasional exposure to extreme temperatures and workplace hazards (such as unprotected heights and hazardous machinery); and can tolerate occasional interactions with supervisors and coworkers and occasional superficial interactions with the general public.

[R. 25–26].

Reaching these conclusions required the ALJ to (1) determine whether an impairment "can be shown by medically acceptable clinical or laboratory diagnostic techniques . . . that could be reasonably expected to produce the claimant's pain or other symptoms" and (2) then "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine

---

[5] SSA maintains a "List of Impairments," with "medical criteria that apply to the evaluation of impairments in adults age 18 and over and that may apply to the evaluation of impairments in children under age 18 if the disease processes have a similar effect on adults and younger children."  See Listing of Impairments, Soc. Sec'y Admin., https://www.ssa.gov/disability/professionals/bluebook/AdultListings.htm.

the extent to which they limit the claimant's work-related activities." [R. 26]. While the ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms," he nonetheless found that the medical evidence did not fully support "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms[.]" [R. 26–27].

In evaluating the record, the ALJ considered evidence from a variety of sources, although he ultimately credited some more than others. For instance, the ALJ appeared to rely heavily on medical records from Drs. Mansfield and Warner in finding that the claimant's shoulder pain was not as intense, persistent, or limiting, as claimed. [R. 27–28, 30–31]. In particular, the ALJ found that Dr. Warner's records supported a finding that Perrino "clinically achieved a good result from his most recent surgery" based on Dr. Warner's findings that Perrino's shoulder did not have any obvious instability after his Latarjet surgery; that the pain Perrino was experiencing was similar to the pain he experienced prior to surgery; that Perrino had full passive range of motion in his shoulder, as well as excellent strength with "structurally everything appear[ing] fine[.]" [R. 27]. On the other hand, the ALJ noted that he did not find the residual functional capacity questionnaire prepared by Perrino's primary care physician, Dr. Barnes, to be persuasive because he found it unsupported by Dr. Barnes' own treatment records. [R. 30].

At step four, the ALJ determined that Perrino is incapable of performing any past relevant work. [R. 31]. At step five, however, the ALJ found that, "considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed[.]" [R. 32 (citations omitted)]. The ALJ therefore found that Perrino was not disabled under the Act. [R. 33].

## II.     STANDARD OF REVIEW

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  Under that section, an individual may obtain judicial review of a final decision of the Commissioner of Social Security by instituting a civil action in federal district court.  See 42 U.S.C. § 405(g).  Under sentence four of § 405(g), the Court has the power "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing."  Id.  A court's decision under sentence four, however, can be based only on a review of the administrative record of proceedings before the Commissioner.  See Whitzell v. Astrue, 792 F. Supp. 2d 143, 147 (D. Mass. 2011) (citing 42 U.S.C. § 405(g)).

Under § 405(g), sentence four, this Court's review of the Commissioner's decision is "limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence."  Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).  In conducting this review, the Court must defer to the Commissioner's factual findings, so long as such findings are "supported by substantial evidence[,]" but the court's review of the Commissioner's conclusions of law is de novo.  Id. (citation omitted); see also Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) ("The ALJ's findings of fact are conclusive when supported by substantial evidence but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." (citations omitted)).

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficien[t] evidence to support the agency's factual determinations. And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is more than a mere scintilla. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (alteration in original) (internal quotation marks and citations omitted). The Court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Rodriguez Pagan v. Sec'y of Health & Hum. Servs., 819 F.2d 1, 3 (1st Cir. 1987) (citing Lizotte v. Sec'y of Health & Hum. Servs., 654 F.2d 127, 128 (1st Cir. 1981)).

### III. DISCUSSION

For the reasons set forth below, the Court finds that the ALJ's decision is supported by substantial evidence.

#### A. The ALJ Properly Evaluated the Supportability and Consistency of Dr. Barnes' Opinion

As both parties note, see [ECF No. 18 at 11; ECF No. 24 at 11], an ALJ is "required to articulate" the supportability and consistency of a medical opinion in determining that opinion's persuasiveness. Nicole C. v. Saul, No. 19-cv-00127, 2020 WL 57727, at *4 (D.R.I. Jan. 6, 2020) (citations omitted); see also Vazquez v. Kijakazi, No. 20-cv-30176, 2022 WL 952764, at *14 (D. Mass. Mar. 30, 2022) ("The new regulations direct an ALJ to explain how he or she considered the supportability and consistency factors when evaluating medical opinions and making the disability determination." (citation omitted)). Regarding the supportability factor, ALJs are required to weigh medical opinions according to the standard that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). As to the consistency factor, an ALJ must examine whether an opinion is consistent with the record as a whole. 20 C.F.R. §§ 404.1520c(c)(2); 416.920c(c)(2); see also Tucker v. Kijakazi, No. 21-cv-10317, 2022 WL 18032978, at *13 (D.

15

Mass. Sept. 30, 2022) ("The consistency factor addresses the opinion's consistency 'with all of the evidence from medical and nonmedical sources.'" (citations omitted)).

Perrino argues that the ALJ improperly omitted any discussion of supportability or consistency as to Dr. Barnes' opinion of Perrino's upper extremity limitations.[6] [ECF No. 18 at 12]. The Court disagrees.

As for supportability, the ALJ found that "Dr. Barnes['] treatment notes do not document objective abnormalities that would support [his opinion that Perrino had] extreme functional limitations." [R. 30]. This finding can plausibly be read as a rejection of all of Dr. Barnes' opinions as to Perrino's functional limitations. While the ALJ's decision on this point is not entirely pellucid, courts have not required ALJs to be "paragon[s] of clarity[.]" Andrews v. U.S. Soc. Sec. Admin., No. 16-cv-00270, 2017 WL 2670735, at *3 (D.N.H. June 20, 2017). Given this deferential approach, the Court finds that the ALJ adequately discussed the supportability of Dr. Barnes' assessment as required by 20 C.F.R. §§ 404.1520c(b)(2) and 404.920c(b)(2).

The same finding pertains to the ALJ's consideration of the consistency of Dr. Barnes' opinions. As noted in the preceding paragraph, the ALJ found that Dr. Barnes' opinion with

---

[6] As set forth above, Dr. Barnes opined that Perrino would not be able to walk for a full city block; could only sit or stand in 15 minute increments; could stand or walk for a total of less than two hours within an eight hour workday (inclusive of breaks); would need accommodations for frequent shifting of position between sitting, standing, and walking; would need to take ten minute walks every 15 minutes; would need unscheduled 15 minute breaks as often as every 15 to 20 minutes to accommodate muscle weakness, pain, paresthesia, and/or numbness; would need to elevate his legs for 15 percent of the workday; would be almost totally incapable of lifting ten pounds, twisting, stooping, crouching, or squatting; would be unable to climb stairs or ladders, grasp, turn, twist, or reach horizontally or overhead with his left upper extremity or perform fine finger manipulations; could not grasp, turn, twist, or reach horizontally or overhead with his right upper extremity or perform fine finger manipulations for 70 percent of the day; would be off task for at least 25 percent of the workday; would be unable to do even "low stress work"; and would have exclusively have "bad days." [R. 573–75].

respect to Perrino's functional limitations was inconsistent with Dr. Barnes' own treatment notes. The ALJ additionally noted that Dr. Barnes' opinion that Perrino could only sit for 15 minutes was inconsistent with the fact that Perrino was able to drive an hour to attend a doctor's appointment. [Id.]. Although the ALJ's discussion of the consistency of Dr. Barnes' opinion was minimal, it is sufficient to satisfy the requirements of 20 C.F.R. § 404.1520c(b)(2). That is especially the case here, where the ALJ found that Dr. Barnes' opinions were unpersuasive on supportability grounds, which alone is a sufficient basis for finding Dr. Barnes' opinion less persuasive than, for example, those of Drs. Mansfield and Warner. Cf. Richardson v. Saul, 565 F. Supp. 3d 154, 169 (D.N.H. 2021) (finding that where an ALJ found a nurse's opinions to be unpersuasive on consistency grounds, "which alone would have constituted sufficient grounds for finding [the nurse's] opinion less persuasive than [other medical professionals'], [the ALJ's] minimal discussion of supportability is sufficient" (citations omitted)).

## B. The ALJ's Evaluation of Perrino's Subjective Complaints of Pain Do Not Warrant Remand

Perrino contends that in determining his residual functional capacity the ALJ mischaracterized and ignored evidence regarding the clinical outcome of his shoulder surgery, including that the doctor who performed the surgery, Dr. Warner, ultimately diagnosed him with "post-surgical adhesive capsulitis and chronic pain." [ECF No. 18 at 14 (citing R. 792)]. The Commissioner responds that the ALJ's decision was sufficiently supported because the ALJ found that Perrino's subjective reports of post-surgery pain were inconsistent with Perrino's "good result from his most recent surgery," which, in turn, was supported by a post-surgery note by Dr. Warner stating that Perrino's "strength was excellent, that his shoulder had 'good function with no instability' and that 'structurally everything appear[ed] to be fine.'" [ECF No. 24 at 9– 10 (alteration in original) (citations omitted)].

17

> The social security regulations require an ALJ to evaluate a plaintiff's subjective complaints pursuant to a two-step process. First, the ALJ determines whether the plaintiff has a 'medically determinable impairment that could reasonably be expected to produce [the] symptoms.' The ALJ next considers the 'intensity and persistence of [the] symptoms' to determine 'the extent to which [the] symptoms limit [Plaintiff's] capacity for work.' That determination 'must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific and clear to any subsequent reviewer.' The 'ALJ's evaluation of complaints of pain' are given 'particular attention' due to the 'subjective nature' of the complaints and the ALJ's ability to 'personally observe[] [the] claimant at the hearing.'

Taylor v. Kijakazi, No. 21-cv-10336, 2023 WL 2163496, * 1 (D. Mass. Feb. 22, 2023) (alterations in original) (citations omitted).

Here, the ALJ found that Perrino had "medically determinable impairments [that] could reasonably be expected to cause the alleged symptoms[,]" but that Perrino's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record[.]" [R. 26–27]. In other words, the ALJ found that Perrino's statements about the extent of his pain were not credible in light of the entirety of the record. Perrino argues that the ALJ's credibility determination was based on a mischaracterization of the record, warranting remand. [ECF No. 18 at 13–14]. He takes particular issue with the ALJ's statement that Perrino achieved a "good result" from his most recent surgery and contends that this statement is factual error, given his post-surgical diagnosis of adhesive capsulitis and chronic pain. [Id. at 14–15 (citing R. 792)]. It is true that Dr. Warner diagnosed Perrino with adhesive capsulitis and chronic pain at his follow-up appointment in April 2020 and that he assigned Perrino home exercises, in part, because his workers' compensation did not cover physical therapy. [R. 792]. But, as the ALJ noted in his decision, [R. 31], at Perrino's subsequent follow-up appointment in July 2020, Dr. Warner found that, with respect to Perrino's shoulder, "structurally everything appear[ed] to be fine[,]" that Perrino had limited active, but full passive, range of motion in his left shoulder, and that his

18

strength was excellent. [R. 793]. In the Court's view, the ALJ's decision with regard to Perrino's subjective complaint of pain satisfies the requirement that the ALJ provide specific reasons, supported by record evidence, that are sufficiently clear to the reviewer. Accordingly, the Court declines to remand the decision on this basis.

## IV.     CONCLUSION

Accordingly, Perrino's motion for summary judgment, [ECF No. 17], construed as a motion to remand the Commissioner's denial of benefits, is <u>DENIED</u> and the Commissioner's motion to affirm, [ECF No. 23], is <u>GRANTED</u>.

**SO ORDERED.**

March 31, 2023                                                                                    <u>/s/ Allison D. Burroughs</u>
                                                                                                              ALLISON D. BURROUGHS
                                                                                                              U.S. DISTRICT JUDGE